## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BLUE STAR LAND SERVICES, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 5:17-CV-931-C |
| | § | |
| THEO C. COLEMAN, | § | |
| JEFFREY D. MORRIS, | § | |
| AMARA S. JOHNSON, *f/k/a* AMARA | § | |
| SINCLAIR, and ROCK CREEK LAND & | § | JURY TRIAL DEMANDED |
| ENERGY COMPANY, LLC, | § | |
| | | |
| *Defendants.* | | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT

Respectfully submitted,

By:   */s/ Matthew M. Mitzner* _____
Matthew M. Mitzner
Texas Bar No. 24068911
*admitted pro hac vice*
matthew.mitzner@tklaw.com
Anthony J. Campiti
Texas Bar No. 00798092
*admitted pro hac vice*
tony.campiti@tklaw.com

**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel. (214) 969-1700
Fax (214) 969-1751

——*with*——

By:     /s/ Lauren Barghols Hanna
        Lauren Barghols Hanna
        OBA # 21594
        lauren.hanna@mcafeetaft.com

        MCAFEE & TAFT
        A PROFESSIONAL CORPORATION
        Tenth Floor, Two Leadership Square
        211 North Robinson
        Oklahoma City, Oklahoma 73102
        Phone:  (405) 552-2343
        Fax:     (405) 228-7343

        ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2017, I served a true and correct copy of the foregoing document on all counsel of record by this Court's ECF filing system.

        /s/ Matthew M. Mitzner
        Matthew M. Mitzner

# TABLE OF CONTENTS

I.   SUMMARY .................................................................................................... 1

II.  RESPONSE TO RULE 12(B)(6) MOTION .................................................... 1

   A.   The law-of-the-case doctrine defeats most of Defendants' Motion. ............. 1
   B.   None of Defendants' allegations in their Motion may be considered
        to determine the Motion under Rule 12(b)(6). ............................................. 3
   C.   Trade-Secret Misappropriation. .................................................................... 3

        1.   Blue Star sufficiently pleaded its misappropriation claim. ................. 3
        2.   Defendants' admissions narrow the existing litigation. ..................... 4
        3.   The trade-secret nature of the stolen information. ............................. 5

             a. Defendants admit their trade-secret challenge is premature. .......... 5

             b. Blue Star's use of the phrase "Trade-Secret Information." ............ 6

             c. The trade-secret nature of Blue Star's clients' documents. ............ 7

             d. The trade-secret nature of Blue Star's work product and
                operating information. .................................................................... 11

             e. Understanding "trade-secret" in the seizure context. ................... 15

        4.   Damages for a trade-secret misappropriation claim ........................ 17

   D.   Breach of Fiduciary Duty. ........................................................................... 20

        1.   Regarding Trade-Secret Information. ............................................... 20
        2.   Regarding "preparations to compete." ............................................. 22

   E.   Duty of Loyalty. .......................................................................................... 24
   F.   Tortious Interference. .................................................................................. 25

III. CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Amoco Production Co. v. Laird,*
  622 N.E.2d 912 (Ind. 1993)........................................................................9

*Black v. Lane,*
  22 F.3d 1395 (7th Cir. 1994) .....................................................................2

*Chloe SAS v. Sawabeh Info. Servs. Co.,*
  No. CV 11-04147, 2014 WL 12599845 (C.D. Cal. Mar. 18, 2014)...................... 15, 17

*Christensen v. Big Horn Cty. Bd. of Cty. Com'rs,*
  374 Fed. App'x 821 (10th Cir. 2010) ..........................................................3

*Douglas v. Steele,*
  816 P.2d 586 (Okla. Civ. App. 1991).........................................................24

*Entek GRB, LLC v. Stull Ranches, LLC,*
  840 F.3d 1239 (10th Cir. 2016) ..................................................................2

*FDIC v. Grant,*
  8 F.Supp.2d 1275 (N.D. Okla. 1998) .........................................................20

*Ford Motor Co. v. O.E. Wheel Distribs., LLC,*
  868 F.Supp.2d 1350 (M.D. Fla. 2012) .........................................................2

*Guth v. Loft,*
  5 A.2d 503 (Del. 1939)...............................................................................24

*Hayes v. Eateries, Inc.,*
  905 P.2d 778 (Okla. 1995) .........................................................................24

*Hertz v. Luzenac Grp.,*
  576 F.3d 1103 (10th Cir. 2009) ................................................................12

*Hodgson v. Farmington City,*
  675 Fed. App'x 838 (10th Cir. 2017)...........................................................1

*Hooper v. State,*
  947 P.2d 1090 (Okla. Crim. App. 1997) ...................................................25

*Hyde Corp. v. Huffines,*
  314 S.W.2d 763 (Tex. 1958) .....................................................................12

*In re Sandridge Energy, Inc. Shareholder Derivative Litigation,*
  No. CIV-13-102-W, 2014 WL 4716006 (W.D. Okla. Sept. 22, 2014).........................8

*In re TXCO Res., Inc.,*
  475 B.R. 781 (W.D. Tex. 2012) .........................................................passim

*Integrated Bus. Techs., LLC v. Netlink Solutions, LLC,*
  No. 16-CV-48-TCK-PJC, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016) ...............13

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,*
  920 F.2d 171 (2d Cir. 1990) .....................................................................12

*Livingston v. State,*
  907 P.2d 1088 (Okla. Crim. App. 1995) ...................................................25

*Lowrance v. Patton,*
  710 P.2d 108 (Okla. 1985) ............................................................................... 20
*Martin's Herend Imports v. Diamond & Gem Trading,*
  195 F.3d 765 (5th Cir. 1999) ............................................................................. 2
*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983) ............................................................................................... 3
*MTG Guarnieri Mfg., Inc. v. Clouatre,*
  239 P.2d 202 (Okla. Civ. App. 2010) .................................................... 5, 14, 15
*Musket Corp. v. Star Fuel of Okla., LLC,*
  606 Fed. App'x 439 (10th Cir. 2015) ............................................................... 18
*Parkinson v. California Co.,*
  233 F.2d 432 (10th Cir. 1956) ............................................................................ 7
*Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.,*
  35 F.3d 1226 (8th Cir. 1994) ...................................................................... 13, 14
*Pre-Paid Legal Servs., Inc. v. Cahill,*
  171 F.Supp.3d 1219 (E.D. Okla. 2016) .............................................................. 6
*ProLine Prods., L.L.C. v. McBride,*
  324 P.3d 430 (Okla. Civ. App. 2014) ............................................................... 14
*Sw. Stainless, LP v. Sappington,*
  582 F.3d 1176 (10th Cir. 2009) ........................................................................ 13
*Tal v. Hogan,*
  453 F.3d 1244 (10th Cir. 2006) .......................................................................... 1
*U.S. v. Gilberson,*
  527 F.3d 882 (9th Cir. 2008) ............................................................................ 17
*UniGroup, Inc. v. Winokur,*
  45 F.3d 1208 (8th Cir. 1995) .............................................................................. 2
*Univ. Computing Co. v. Lykes-Youngstown Corp.,*
  504 F.2d 518 (5th Cir. 1974) ............................................................................ 18
*Warren v. Century Bankcorporation, Inc.,*
  741 P.2d 846 (Okla. 1987) ................................................................................ 24

## RULES AND REGULATIONS

18 U.S.C. § 1836(b)(1) ............................................................................... 3, 4
18 U.S.C. § 1836(b)(2)(A)(i) & (ii) ............................................................ 2, 4
18 U.S.C. § 1836(b)(2)(D)(ii) ........................................................................ 15
18 U.S.C. § 1836(b)(2)(G) ............................................................................. 17
18 U.S.C. § 1839(5)(A) ................................................................................... 5

## OTHER AUTHORITIES

130 Cong. Rec. H12076 ................................................................................. 17

OUJI-Civ. 29.1 ............................................................................................................ 18

OUJI-Civ. 29.5 ............................................................................................................ 19

RESTATEMENT (THIRD) OF AGENCY §§ 8.01–8.12 (2006) ......................................... 20, 21

Restatement of Torts § 757 (1939) .......................................................................... passim

## I.   SUMMARY

Defendants' Motion lacks merit.[1] Defendants filed the 23-page Motion to Dismiss—littered with more than seven pages of irrelevant counter-allegations[2] in a transparent PR-type move—without even once referencing the governing *Twombly / Iqbal* pleading standards. The Court already examined Blue Star's Complaint alongside voluminous attached evidence and held—under a much higher standard than under Rule 12(b)(6)—that, "after review of [Blue Star's] Complaint and the supporting documentation, the Court finds that [Blue Star] has alleged facts demonstrating that the Defendants have improperly obtained trade secrets in violation of the DTSA." (Dkt. 10 at 2.)[3] Thus, the law-of-the-case doctrine defeats the majority of Defendants' Motion.

## II.   RESPONSE TO RULE 12(b)(6) MOTION

### A.   The law-of-the-case doctrine defeats most of Defendants' Motion.

By their Motion, Defendants effectively seek reconsideration of the Court's Seizure Order, in which the Court examined the sufficiency of Blue Star's Complaint and exhibits and held that, "after review of [Blue Star's] Complaint and the supporting documentation, the Court finds that [Blue Star] has alleged facts demonstrating that the Defendants have improperly obtained trade secrets in violation of the DTSA." (Dkt. 10 at

---

[1]    Capitalized, undefined terms used herein take the meaning set forth in Dkt. 3.

[2]    Defendants' discussion opens the door and compels Blue Star's response to correct the more egregious representations made.

[3]    Defendants' challenge necessarily requires consideration of the Seizure Order. "'[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.'" *Hodgson v. Farmington City*, 675 Fed. App'x 838, 839–40 (10th Cir. 2017) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1264–65 n.24 (10th Cir. 2006)).

2.) The Court found that under the DTSA it "clearly appeared from specific facts," which Plaintiff verified and presented, that Plaintiff's DTSA claim met the statute's eight factors a much higher standard than under Rule 12(b)(6). *See* 18 U.S.C. § 1836(b)(2)(A)(i)&(ii). That determination required the Court to consider extensive evidence from Blue Star and ultimately resulted in an evidentiary hearing. Perhaps precisely for these early-action, evidentiary decisions—even where a defendant later brings an action for wrongful seizure—"a court will not revisit whether the *ex parte* seizure should have been granted in the first instance." *See Ford Motor Co. v. O.E. Wheel Distribs.*, LLC, 868 F.Supp.2d 1350, 1371 (M.D. Fla. 2012) (citing *Martin's Herend Imports v. Diamond & Gem Trading*, 195 F.3d 765, 773 (5th Cir. 1999)).

Seizure orders necessarily involve determining a misappropriation claim's viability. 18 U.S.C. § 1836(b)(2)(A)(i)&(ii); *see also Black v. Lane*, 22 F.3d 1395, n.5 (7th Cir. 1994) (holding a court's denial of summary judgment—because it found a genuine issue of material fact—also implicitly found that the complaint stated a cause of action); *UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211–12 (8th Cir. 1995) ("The doctrine of law of the case precludes litigation of matters that are decided implicitly, as well as those decided explicitly.") *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (J. Gorsuch writes that the "doctrine permits a court to decline the invitation to reconsider issues already resolved earlier in the life of a litigation"). And here, an additional reason may motivate this Motion: an attempt to get a premature, advisory opinion concerning the wrongful-seizure claim that Defendants have threatened but never pleaded.

Denying the Motion under this doctrine remains subject to the Court's discretion. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 & n.14 (1983). But finding that the Complaint fails to state a claim for misappropriation would directly conflict with the Court's Seizure Order—likely causing unintentional consequences and significant cost, given the Court-appointed work Ernst & Young has already performed forensically. (*See* Dkt. 10.) Consequently, Defendants' Motion should be denied.

**B.      None of Defendants' allegations in their Motion may be considered to determine the Motion under Rule 12(b)(6).**

In their Motion, Defendants allegedly a lengthy recitation of wholly unsupported counter-allegations that contradict allegations in the Complaint, perhaps for public-relations purposes. It is well established that the Defendant's allegations—especially where they contradict allegations in the Complaint—may not be considered to determine a 12(b)(6) Motion. *See Christensen v. Big Horn Cty. Bd. of Cty. Com'rs*, 374 Fed. App'x 821, 825 (10th Cir. 2010). And because Defendants fail to attach evidence, there is no possibility to convert the Motion to a successful motion for summary judgment. Additionally, the materials that Ernst & Young collected by Court-appointment have not yet been made available to the parties, nor have the parties engaged in discovery.

**C.      Trade-Secret Misappropriation.**

*1.      Blue Star sufficiently pleaded its misappropriation claim.*

A DTSA action requires simple proof: "An owner of a trade secret that is misappropriated may bring a civil action … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C.

§ 1836(b)(1). And this Court has already held this claim is sufficiently pleaded. To issue the Seizure Order (Dkt. 10), the Court had to expressly find that specific, verified facts "clearly appeared" in Blue Star's pleadings sufficient to satisfy each of the DTSA's eight required elements. *See* 18 U.S.C. § 1836(b)(2)(A)(i)&(ii). One of the eight elements that the Court found was that Blue Star "is likely to succeed in showing that Defendants took a trade secret(s) by improper means or conspired to use improper means to misappropriate the trade secret(s)," which the Defendants possessed. (Dkt. 10 at 2.)

### 2.    *Defendants' admissions narrow the existing litigation.*

In their Motion, Defendants admit that Coleman took his Blue Star emails and retained his Dropbox account with Blue Star information in it. (Dkt. 34 at 6.)[4] And Defendants previously submitted testimony from Coleman in which he admits that what he took from Blue Star "would be primarily located in the 'Theo folder'" of his Dropbox, where Ernst & Young's presuit investigation showed the "Stuff" subfolder holding the misappropriated Blue Star materials. (Dkt. 22-1 at ¶¶ 3–4, 7; *see also* Dkt. 34 at 6.)

Two deductions follow from Defendants' admissions. *First*, Defendants' testimony confirms they were untruthful to Blue Star each of the three times that Blue Star previously confronted them about possessing information they took from Blue Star.

*Second*, and perhaps more importantly, Defendants' admissions narrow this litigation as it currently exists. By admitting to possessing Blue Star's information— barring an order that nothing Defendants took was trade secret—Defendants have

---

[4]    Addressing Defendants' Motion admittedly involves a discussion of evidence due to the nature of Defendants' arguments and the case's procedural setting, which as explained above makes this costly endeavor improper.

admitted to misappropriation. "Misappropriation" occurs when one "acqui[res] a trade secret of another" when he or she is "a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). Among other things, "improper means" includes theft, misrepresentation, or breaching or inducing a breach of a duty to maintain secrecy. *Id.* at (6). Blue Star has alleged all of these items and acts by the Defendants in its Complaint, and Defendants admit possessing Blue Star's identified information, thus implicitly admitting their use of "improper means" of misrepresentation to obtain the information—if not also acquiring it via theft.

Thus, while Blue Star in no way abandons its full pleadings (including its allegations about Defendants' use of the stolen information),[5] Defendants' admissions make the dispute about Defendants' liability about "to what extent" rather than "if."

### 3.     *The trade-secret nature of the stolen information.*

Like many states around the country, Oklahoma applies the trade-secret definition in Restatement of Torts § 757 (1939) (hereafter, "Restatement § 757") "to facilitate application of the tests embodied in the [OUTSA]." *See MTG Guarnieri Mfg., Inc. v. Clouatre*, 239 P.2d 202, n.15 (Okla. Civ. App. 2010).

### a.   *Defendants admit their trade-secret challenge is premature.*

In Defendants' opening argument, they predict that, after the Court denies their present Motion, "the nature of the items seized" will be extensively litigated. (Dkt. 34 at

---

[5]     Blue Star submitted copious evidence supporting its allegations that Defendants' operation inevitably *required* the use of Blue Star's protected information. (Dkt. 3-46.) The Defendants create a red-herring, pointing to the sole paragraph in which Blue Star admits that, for a portion of its injury, the seizure was necessary to confirm *the full extent and manner* of how certain information *was used*. (Dkt. 34 at 14 (citing Dkt. 3 at ¶ 78).)

7.) Defendants correctly—if only implicitly—admit their challenge is premature. "Whether [plaintiff's] information in fact qualifies as a 'trade secret' under the OUTSA is not properly before the Court at this stage of litigation…" *Pre-Paid Legal Servs., Inc. v. Cahill*, 171 F.Supp.3d 1219, 1227 (E.D. Okla. 2016) (addressing motion to dismiss). Nevertheless, because of the Motion's dispositive nature, Blue Star must fully respond.

### b. *Blue Star's use of the phrase "Trade-Secret Information."*

Throughout their Motion, Defendants wholly ignore the existence and content of Dkt. 3-46—the Verified Trade-Secret Exhibit expressly incorporated into Blue Star's Verified Complaint. Defendants' oversight results in many false statements.

For example, Defendants say that "Plaintiff never actually alleges that Defendants' actually misappropriated 'trade secrets' as contemplated by the DTSA or OUTSA as necessary to allege a viable claim." (Dkt. 34 at 11.) Of course, the Verified Trade-Secret Exhibit (Dkt. 3-46) quotes the definition of "trade secret" verbatim from the DTSA (page 1) and the OUTSA (page 2), and then uses those standards to structure the extensive discussion that follows about the three subtypes of trade-secret information Defendants took (*i.e.*, client-specific, work product, and operating information).

Another false statement is that Blue Star adopted a definition for the meaning of "trade secret" from its employment contract rather than the definitions listed under the DTSA or OUTSA. (Dkt. 34 at 9–10.) In actuality, Blue Star used a single phrase—Trade-Secret Information—to streamline the reference for the already lengthy Complaint. Defendants neglect to continue reading the Complaint on page 9 (where Trade-Secret Information is first defined), which explicitly describes the term by the three subtypes

extensively discussed in the Trade-Secret Exhibit. (*See* Dkt. 3 at 9.) Thus, it is flatly inaccurate to say that Blue Star used "Trade-Secret Information" to refer to materials that were not protected by applicable law.[6] Thankfully, the Court's Seizure Order shows clarity, as the Court correctly referred to the items listed by filename in the single "Stuff" folder as they were identified in the Trade-Secret Exhibit. (*See* Dkt. 10 at 4.)

c.   *The trade-secret nature of Blue Star's clients' documents.*

Defendants remarkably predict, in their opening argument, that Blue Star's clients will probably not contend that things like their confidential rig schedules and maps are "trade secrets." (Dkt. 34 at 7.) Blue Star disagrees. Companies like Blue Star's clients

> typically obscure their lease acquisition activities in order to keep their interest in a given area out of the public spotlight (in an attempt to control the inevitable inflation of lease costs when mineral owners find out that industry leaders are interested in their land), they typically acquire leases utilizing brokers or agents who subsequently assign title to those mineral lease interests to the company at a later date…

> Technological innovations in horizontal drilling, and multi-stage fracture stimulation (known as "fracking") completion technologies, have unlocked previously unavailable potential in [certain areas with producing history]. Because of [that history], however, there is an incredible amount of historical geological data that any prudent exploration company would analyze before adopting an acquisition strategy.

> Moreover, a prudent exploration company would develop new geological information to confirm its analysis of the historical data [by, among other things,] drilling mostly vertical wells … to confirm geological concepts, gather subsurface geological data in the form of drill cutting samples and

---

[6]    It is *also* true that Blue Star's policies—as set forth in the contracts staff signed as a condition of their beginning work at Blue Star—protected the information its staff handled, especially for purposes of Blue Star's fiduciary-duty claim. (Dkt. 3 at ¶ 21.) But to the extent any ambiguity remains about Blue Star's phrase, the ambiguity is construed in Blue Star's favor. *See Parkinson v. California Co.*, 233 F.2d 432, 436 (10th Cir. 1956).

cores, update their reservoir analysis, and test for the presence and quality of hydrocarbon saturation.

An exploration company acquires data at substantial cost, both in the acquisition of historical and third party developed information and by drilling and completing new wells. The cost to analyze and learn from this data, while coordinating the analysis and field efforts between various disciplines (including but not limited to geology, geophysics, land and lease acquisition, reservoir engineering and economics, drilling engineering, and completion and production engineering) can run into the millions of dollars. That is the reason this type of work is most effectively pursued by large independent exploration companies … which have the financial capability to undertake this type of work.

*In re Sandridge Energy, Inc. Shareholder Derivative Litigation*, No. CIV-13-102-W, 2014 WL 4716006, at *4–5 (W.D. Okla. Sept. 22, 2014). The Court went on to hold that the plaintiffs had "sufficiently identified confidential and proprietary information that qualifies as a 'trade secret' under the UTSA's broad definition of that term." *Id.* at *9.

Blue Star's role in the above-described process assists clients' "land and lease acquisition," which is what requires Blue Star to possess information revealing the client's business plans: so Blue Star can execute. (*See, e.g.*, Dkt. 3-46 at 4–6.) Blue Star also assists its clients in obtaining regulatory approval to drill. (Dkt. 3-46 at 6–7.)

In a case closely analogous to *this* case, the United States Bankruptcy Court for the Western District of Texas engaged in a lengthy analysis of trade secrets in the oil and gas industry, and applied the same law applicable in Oklahoma, *i.e.*, Restatement § 757. *See In re TXCO Res., Inc.*, 475 B.R. 781, 805 (W.D. Tex. 2012). Like *In re Sandridge*, the court in *In re TXCO* explains well the extensive nature and necessity of trade-secret protection to enable the industry's very existence:

Information relevant to oil and gas exploration and production is frequently treated as trade secret within the industry and at common law…

[For example, in addition to multiple cases in Texas and the Fifth Circuit, omitted here] in *Amoco Production Co. v. Laird*, the Indiana Supreme Court held that information regarding the potential location of oil fields was entitled to trade secret protection. 622 N.E.2d 912, 920–21 (Ind. 1993).… The court further stated that "without the availability of trade secret protection, particularly with respect to exploration and subterranean natural resources, corporations and individuals would not risk the large sums of money for geophysical exploration, an expensive but only infrequently rewarding adventure."

*In re TXCO Res., Inc.*, 475 B.R. at 805–07. This case informatively addresses precisely

the information *type* Defendants took from Blue Star—oil and gas operations data:

"Operations data" includes a company's land and lease files, drilling schedules, farm outs, and [joint exploration agreements] with other companies ["JEAs"], authorizations for expenditure, and fracturing designs. Land and lease files contain all information about an oil and gas lease, including a summary and general terms of the lease, the location and number of acres, royalty burdens, and drilling schedules. Land and lease files reveal a company's acreage position, lease expiration dates, drilling requirements, and renewal measures. Typically, a farmout or JEA contains lease-specific information about lessors, leased acreage, terms, drilling schedules, and requirements to extend leases. Farmouts and JEAs reveal a strategy for mutual development because they describe lands and leases subject to the agreement and determine how wells are drilled and costs shared between operating partners. AFEs are detailed cost estimates that are necessary to accurately predict the economics of drilling operations…

Operations data [thus] represents the acquired knowledge and strategies a company uses to guide its business decisions…

Some operations data was publicly available to others in the E & P business. Oil and gas operators in [the area] generally knew the identity of landowners, the location and extent of their property, and the general acreage positions of other operators in the area… TXCO's vendors had access to a substantial amount of TXCO's operations data, including AFEs, fracturing designs, and drilling schedules, because it was necessary to perform their duties. Service providers that were hired … were typically not

bound by confidentiality agreements, but were hired under an expectation of loyalty and confidentiality.

TXCO's operations data was valuable to its business and its competitors because it was difficult and expensive to acquire… Land and lease files are valuable because they reveal a company's business strategy through its acreage position, lease expiration dates, drilling requirements, and renewal measures… A company with TXCO's operations data would have "a window into the strategy of the company and where it plans to develop, which direction, what part of the play, and where it's going to spend its capital."

*In re TXCO Res., Inc.*, 475 B.R. at 813–15 (omitting citations). The Bankruptcy Court for the Western District of Texas ultimately held that "the Restatement's six-factor test weighed in favor of trade secret status for TXCO's operations data." *Id.* at 815.

Indeed, it is worth noting that an *exhibit attached to Blue Star's Complaint* shows Coleman—when acting as Blue Star vice president—instructing Blue Star's entire staff that they should not dispose of "proprietary information" or client information, like excerpts of title opinions, ownership reports, address lists, and "anything else that isn't of public record," in regular trashcans, but that those materials should be disposed in the locked shred-boxes in Blue Star's office. (Dkt. 3-45.)

Separate from the *client's* interests in this information, Defendant Coleman admits that, for companies like Blue Star, possessing historical client work product is *essential* to properly serve clients in their operations:

- "Many times, Rock Creek's clients need to review historical reports. If they have questions about a previous report that it has submitted, Rock Creek will not have access to review that report to address the client's concerns."

- "Section indexes are maintained on the server. Rock Creek has been collecting these indexing for several months. When someone is running a report on a section the company has already worked, Rock Creek supplies

them with a copy of the index so they do not need to purchase a new copy at the courthouse. Obtaining such index copies are costly and time consuming, often taking days to get a copy of this index especially in certain counties where the bulk of Rock Creek's work is located." (Dkt. 22-

- "Further, Rock Creek does not have access to templates it created to set up new hires with the paperwork and reporting tools they need to do their job."

(Dkt. 22-1 at ¶¶ 10(a)(iii)–(iv), (b).) These are (a) the very types of documents that Blue Star established Defendants took when they left Blue Star to start a competing company for some of Blue Star's existing clients (Complaint Exh. 1-2–1-8), and (b) precisely the sorts of information that the DTSA protects. (*See generally* Dkt. 3-46.)

In sum, Defendants' unsupported and unsupportable *prediction* about Blue Star's clients' positions concerning the information that Defendants took is both inaccurate and, as will be seen, is a position they take solely for the purposes of the litigation.

### d. *The trade-secret nature of Blue Star's work product and operating information.*

Blue Star's "Work Product" includes the Work Templates Blue Star used to create its work product. (Dkt. 3-46 at 6–7.) Defendants allege that Blue Star's Work Templates are not trade secrets. (Dkt. 34 at 7.) They say "general templates … based on personal knowledge or publicly available materials, never subject to recall or destruction provisions by Blue Star, can[not] ever be considered 'trade secrets.'" (Dkt. 34 at 7.)

That is both factually and legally incorrect. Factually, every staff member signed a contract as a condition of their initial relationship with Blue Star, which (a) included explicit instructions not to use the information related to their work for any non-Blue-Star purpose, (b) included a recall provision, *and* (c) established the signatory's contractual

obligation to return the information upon termination. (Dkt. 3-24 at 2.) And "[a]lthough the law requires secrecy, it need not be absolute":

> A holder may, without losing trade secret protection, communicate a trade secret to employees involved in its use and may likewise communicate it to others pledged to secrecy… A holder may divulge his information to a limited extent without destroying its status as trade secret. To hold otherwise would greatly limit the holder's ability to profit from his secret. If disclosure to others is made to further the holder's economic interest, it should, in appropriate circumstances, be considered a limited disclosure that does not destroy the requisite secrecy.

*In re TXCO Res., Inc.*, 475 B.R. at 805 (quoting Restatement § 757). As a result, a confidential relationship is not even a necessity to maintain the protection. *See id.* The secret is protected "if the owner 'creates a duty in some manner and places that duty upon another not to disclose or use the secret.'" *Id.* (noting *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 777 (Tex. 1958) ("express agreement not necessary" if "a confidential relationship" exists between the parties under the circumstances)).

Defendants' position concerning Blue Star's Work Templates is also the opposite of what longstanding law directs:

> [A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret… [T]he architecture of [the] product, or the way in which [plaintiff's] various components fit together as building blocks in order to form the unique whole … was secret… [T]he expert testimony reveals that the [plaintiff's] product's architecture could not be readily duplicated without the secret information acquired by [plaintiff] through years of research. The architecture of the [information] was not 'readily ascertainable'…

*See, e.g.*, *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990); *see also Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1109 (10th Cir. 2009)

(same holding).[7] Indeed, "[t]he more difficult, time consuming and costly it would be to develop the information, the less likely it is 'readily' ascertainable." *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1236 (8th Cir. 1994).[8] Defendants have implicitly admitted that Blue Star's Work Templates have significant value, as even Coleman said Defendants could not operate without their templates for Rock Creek's staff. (Dkt. 22-1 at ¶ 10(b).) Indeed, the fact that the Defendants misrepresented their compliance with the Seizure Order enhances this conclusion. (*See* Motion to Expand Preliminary Injunction filed contemporaneously with this Response.) Accordingly, in its Complaint, Blue Star extensively discussed how its work product and operating information[9] would *enable even the possibility of* Rock Creek's hitting the ground running in the business a mere five months into existence—in which time, Coleman says, Defendants have already amassed "twelve or thirteen clients that Rock Creek works with on a regular basis" and a staff of some "40 individuals…" (Dkt. 22-1 at ¶¶ 10(a), 11.) Indeed, Ernst & Young has testified to hundreds of thousands of documents on their computers. (Tr. 25:1–3; 27:2–3.) This evidence collectively suggests a significant

---

[7]    Cases from other jurisdictions cited herein use the same law applied in Oklahoma (*i.e.*, Restatement § 757).

[8]    "When money and time are invested in the development of a procedure… which is based on an idea which is not new to a particular industry, and when that certain procedure… is not generally known, trade secret protection will exist." *In re TXCO Res., Inc.*, 475 B.R. at 805.

[9]    "The Tenth Circuit has explained that '[a]s a general matter, confidential data regarding operating and pricing policies can … qualify as trade secrets.'" *Integrated Bus. Techs., LLC v. Netlink Solutions, LLC*, No. 16-CV-48-TCK-PJC, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016) (quoting *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1189 (10th Cir. 2009)).

operation—to the extent the documents Ernst & Young located are not Blue Star's or derivatives of the stolen information.

"A trade secret is 'used' if a product or process is substantially derived from the trade secret, even if it is with independent improvements or modifications." *See ProLine Prods., L.L.C. v. McBride*, 324 P.3d 430, 433 (Okla. Civ. App. 2014) (citing *MTG*, 239 P.2d at 211). "If the law were not flexible enough to reach such modifications, trade secret protection would be quite hollow." *MTG*, 239 P.3d at 211. "Use" includes things like "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of" the information. *In re TXCO*, 475 B.R. at 821. Notably, the nature of the Defendants' misconduct should be considered alongside Restatement § 757's six factors. *See In re TXCO Res., Inc.*, 475 B.R. at 805.

Accordingly, Defendants say without support that they created their templates "from scratch." (Dkt. 34 at 6.)[10] They allege this attempting to avoid liability—but even if it were somehow true, such facts would not relieve these Defendants of all exposure:

> To subject a person to liability … for the use of another's trade secret, there is no requirement that he use it exactly in the form in which he received it… The liability is avoided only when the contribution by the other's secret is so slight that the actor's process can be said to be derived from other sources; ***although even in such a case*** the actor is still subject to liability for harm caused by this disclosure or possession of the secret.

---

[10]      Defendants' allegations collaterally suggest that, if the Work Templates *could have been* made from scratch by a competitor, they cannot be trade secret. That is false. "Many courts have held that the fact that one 'could' have obtained a trade secret lawfully is not a defense if one does not actually use proper means to acquire the information." *Pioneer*, 35 F.3d at 1237 (collecting cases).

*MTG,* 239 P.2d at n.26 (quoting Restatement § 737 cmt. c (1939) (emphasis added)). Despite Defendants' allegations, the admitted circumstances—that Rock Creek was able to begin operating at such a vast scope and size within a period of weeks (if not days)— suggest the implausibility (if not impossibility) of Defendants' position.

### e. *Understanding "trade-secret" in the seizure context.*

After its investigation, Ernst & Young confirmed Coleman's download over several days of Blue Star's Trade Secret Information to his Dropbox, to a single folder called "Stuff."[11] (Dkt. 4 at 19.) Because of their central location together, Blue Star asked the Court to seize that single electronic folder.[12] And as Blue Star explained, because of the information's electronic nature, "neither Blue Star nor the Court could know, prior to carrying out an order for seizure, to what devices or drives Defendants have downloaded the Trade-Secret Information from their electronic storage accounts." (Dkt. 4 at 19.)

The Court agreed that Blue Star had "as narrowly as practical identified the items to be seized and the type of search to be performed" (Dkt. 10 at 3), which extended to the devices and electronic locations to which it could be reasonably anticipated that

---

[11]     While all of the items listed in Exhibits 1-2 through 1-8 were (based on EY's review) located in the single Dropbox folder, for clarity and convenience with the exhibits, Blue Star submitted the information in seven parts, separated by the day on which Coleman had downloaded the listed information. (*See* Tr. 14:20–22.)

[12]     Blue Star could not have "seized" any materials in the "Stuff" folder selectively without capturing the entire location in which they were housed; separating the files within it based upon file name would require altering the evidence if not also first examining them. Indeed, the application in *Chloe* is wholly consistent with the DTSA's directives about how to handle seizing electronic materials: *See, e.g.,* 18 U.S.C. § 1836(b)(2)(D)(ii) ("If the seized material includes a storage medium, or if the seized material is stored on a storage medium, the Court shall prohibit the medium from being connected to a network or the Internet without the consent of both parties, until the hearing required under subparagraph (B)(v) and described in subparagraph (F).").

Defendants may have downloaded the Trade-Secret-Information. (*See* Dkt. 4 at 19.) To meet DTSA's directives, Blue Star asked for an "overly narrow" seizure for both content (*e.g.*, excluding derivatives, even though the DTSA protects them) and devices (*e.g.*, only the Defendants', not those of all Rock Creek staff with access to the Dropbox account or its information). Blue Star had hoped the Marshals' taking the Defendants' devices by court order would fill the gap from seeking a very narrow seizure.

Defendants say that the "vast scope of the overly expansive definition [of 'trade secret'] can be plainly seen in the documents Plaintiff" seized, selecting from the list of thousands of Blue Star documents the small handful of personal items Coleman intermixed with Blue Star's information, just before exiting Blue Star. (Dkt. 34 at 12.) Defendants suggest that Blue Star says Coleman's personal items are purported trade-secret information which is "far beyond that permitted by the DSA." (Dkt. 34 at 13.)

Those statements are more than misleading. They are flatly untrue. Defendants betray a fundamental misunderstanding of the seizure's nature by arguing that the scope of this seizure is somehow wrongful because Coleman mixed it with his personal items. The small number of personal files listed were simply those located *together in the same folder* in which Coleman chose to drop Blue Star's information. Seizing that single folder is no different than freezing an individual's bank account in which they also placed embezzled funds. It is one, electronic account. In such circumstances, the only viable option is seizing the single container: "When dealing with electronically stored information, it is almost inevitable that data related to [illegal] activities would be

intermingled with data related to more legitimate activities." *Chloe SAS v. Sawabeh Info. Servs. Co.*, No. CV 11-04147, 2014 WL 12599845, at *11 (C.D. Cal. Mar. 18, 2014).

"The [defendants] cannot hold the [plaintiffs] liable [for wrongful seizure] simply by pointing out this unavoidable fact. If the Court were to hold otherwise, it would make it nearly impossible for plaintiffs to act upon seizure orders without risking similar liability." *Id.* A "search (or seizure) of computer files may be justified even if many of the files are irrelevant." *See id.* (citing *U.S. v. Gilberson*, 527 F.3d 882, 888 (9th Cir. 2008)).

As courts addressed seizure of electronic forms of intellectual property, they immediately recognized that an electronic seizure presents a type of case fundamentally different than those involving physical goods.[13] Seizure of servers or devices that include "substantial legitimate data" (*i.e.*, legally unprotected data) cannot be equated with the seizure of physical goods, cases concerning which are "irrelevant" to electronic seizure. *Chloe*, 2014 WL 12599845, at *11. In holding that this sort of electronic seizure was proper, the court noted: "Moreover, prior to acting on the Court's authorization, Plaintiffs retained a computer expert to ensure that they performed the seizure properly." *Chloe*, 2014 WL 125899845, at *12. All of the above is also true for Blue Star here.

### 4.   *Damages for a trade-secret misappropriation claim.*

Defendants cite to the Oklahoma Uniform Jury Instructions in an attempt to convince the Court that "Oklahoma law further requires that the purported

---

[13]   To guide DTSA seizures, Congress stated that "the act leaves the definition of 'wrongful seizure' to case-by-case interpretation in light of rule 65 and other precedents." *See* 130 Cong. Rec. H12076, at 12083; *see also* 18 USC § 1836(b)(2)(G) (referring to section 34(d)(11) of the Trademark Act of 1946 for remedies).

'misappropriation of the trade secrets was the direct cause of *damages* to Plaintiff." (Dkt. 34 at 15 (emphasis added).) This phrasing is misleading. While the OUJI uses the word "damages" in the instruction, the comments make clear that the instruction is derived from caselaw, specifically from a misappropriation claim's third element—the "use of the secret by the defendants *to the detriment* of the plaintiff." OUJI-Civ. 29.1 (emphasis added). This Court has already found that, due to the circumstances, Blue Star presented "an immediate and irreparable injury" (Dkt. 10 at 2).

Regardless, "[i]n any claim for trade secret misappropriation, the calculation of damages requires a flexible and imaginative approach." *In re TXCO*, 475 B.R. at 822 (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)[14]). "Because each case is controlled by its own peculiar facts and circumstances, damages must be calculated 'to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use to which the defendant put the trade secret after misappropriation.'" *Id.* (quoting *Univ. Computing Co.*, 504 F.2d at 538).

The total scope of Blue Star's injury from Defendants' use may remain for discovery, but Blue Star has properly pleaded the following damages in its Complaint, *e.g.*: (a) the value of Blue Star's Work Templates, which Blue Star explicitly ties to its yearly profits (Dkt. 3-46 at ¶ 22); (b) any impact to the value of client information subject to confidentiality agreements with those clients (Dkt. 3-46 at 6–12; Dkt. 3 at ¶ 20);

---

[14]     This Fifth Circuit case has been applied under Oklahoma law. *See Musket Corp. v. Star Fuel of Okla., LLC*, 606 Fed. App'x 439, 452 (10th Cir. 2015) (unpublished op.).

(c) Blue Star's relationship with its clients and market reputation are inherently damaged by the existence of this suit and its circumstances (that Blue Star's only two vice presidents engaged in this behavior) (Dkt. 3 at ¶ 20); (d) the lost market-share value for Blue Star now that it has a new competitor in Rock Creek that—to come into its very existence to compete for the same client work—possessed and used Blue Star's trade secrets, including both Blue Star's Work Product and Operating Information (Dkt. 3-46 at ¶¶ 23, 28); (e) the business and profits Rock Creek obtained by taking historical client work product related to *active* client work (Dkt. 3 at 29–31), which information Coleman says is essential to serving those clients (Dkt. 22-1 at ¶ 10(a)(iii)–(iv)); and (f) lost value from losing Blue-Star-trained employees and staff, who Coleman and Morris (while vice-presidents) recruited away by knowing Trade-Secret Information, giving them a competitive advantage (Dkt. 3 at 31).[15]

And as OUJI-Civ. 29.5 shows, a portion of the damages owed for misappropriation come directly from evidence that, currently, only the Defendants possess: "The net profit or other benefit that Defendant unjustly received from the misappropriation." Thus, to some extent it is necessarily true that a portion of the scope of Blue Star's injury remains to be investigated by a review and understanding of the materials Ernst & Young seized and production in discovery. For this reason, Defendants' complaints that the matter has not already been immediately resolved— before and *in lieu of* reviewing the results of Ernst & Young's investigation—by some compromise (Dkt. 34 at 6–7), leave Blue Star extremely perplexed.

---

[15]     These are just examples, and Blue Star defers to the content of its Complaint.

Regardless, the overwhelming message of the Complaint (and Verified Trade-Secret Exhibit) is that Defendants could not be operating for these clients and on the scope that Defendants are—*but for* having taken Blue Star's information as they did.

## D.     Breach of Fiduciary Duty.

Defendants say that Blue Star's breach-of-fiduciary-duty claim fails because "Defendants acted permissibly in their preparations to leave Blue Star." (Dkt. 34 at 15.) This merits challenge is inappropriate for a motion to dismiss for failure to state a claim, and should accordingly be dismissed out of hand.

Agents have fiduciary duties to their principals, and such relationships arise "anytime the facts and circumstances surrounding a relationship would allow a reasonably prudent person to repose confidence and trust in another person." *FDIC v. Grant*, 8 F.Supp.2d 1275, 1296 (N.D. Okla. 1998) (citing *Lowrance v. Patton*, 710 P.2d 108, 111 (Okla. 1985)). For examples of duties agents like Coleman and Morris have to principals like Blue Star, Oklahoma Uniform Jury Instruction 26.3's comment refers to the RESTATEMENT (THIRD) OF AGENCY §§ 8.01–8.12 (2006) (hereafter, "Agency Restatement"). As agents, they must "act loyally for the principal's benefit in all matters connected with the agency relationship," and "refrain from using the agent's position or the principal's property to benefit" themselves. *Id.* at § 8.01.

### 1.     *Regarding Trade-Secret Information.*

Specifically, the agent's duty regarding the principal's information extends to *all* confidential information the agent learns while working for the principal, not just that covered by trade-secret protections. Agency Restatement § 8.05 cmt. c. "Termination of

an agency relationship does not end an agent's duties regarding property of the principal. A former agent who continues to possess property of a principal has a duty to return it and to comply with [] management and record-keeping rules..." *Id.* at cmt. b.

Defendants now say Coleman and Morris always maintained the confidentiality of the "Trade-Secret Information." (Dkt. 34 at 15.) Even if this were true, it is of no moment: "An agent's use of the principal's confidential information for the agent's own purposes breaches the agent's duty as stated in subsection (2) although the agent's use of the information does not necessitate revealing it." Agency Restatement § 8.05 at cmt. c.

But Defendants' allegation is also manifestly *untrue*. Blue Star submitted evidence with its Complaint showing Coleman and Morris using Blue Star's own information competitively against Blue Star. (*E.g.*, Dkt. 3-46 at 12–18 (operating information).) Moreover, all of Rock Creek's templates are evidence of the breached fiduciary duty, irrespective of the validity of Defendants' claim to have made them from scratch:

> An agent's duties concerning confidential information do not end when the agency relationship terminates. An agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record of them or retains them in the agent's memory. If information is otherwise a trade secret or confidential, the means by which an agent appropriates it for later use or disclosure should be irrelevant. Feats of human memory, however commendable and intriguing in many respects, should not be privileged as instruments of disloyal conduct.

Agency Restatement § 8.05 cmt. c. Indeed, even Coleman's mixing of Blue Star's information with his personal information violates his duty. *See* Agency Restatement § 8.12(2) (agent's duty "not to mingle the principal's property with anyone else's").

Coleman admits in his sworn statement that he developed business for Rock Creek from an existing Blue Star client, presented to Coleman during the time he was Blue Star's VP – Business Development. This violated his fiduciary duty to Blue Star. *See* Agency Restatement § 8.05 cmt. b (using the principal's property in "developing a business opportunity that should not have been taken personally by the agent," violates the fiduciary duty). Both Coleman and Morris used their Blue Star computers and information, to compete with Blue Star (*e.g.*, Dkt. 3 at ¶ 44 (Coleman describing his replacing "Blue Star" with "Rock Creek" on a client contract for work they were taking)). *See* Agency Restatement § 8.05 cmt. b (using the principal's property "in the course of breaching the agent's duty by competing with the principal," violates the fiduciary duty).

### 2.      *Regarding "preparations to compete."*

One's fiduciary duty prohibits certain kinds of competition:

> a former agent, or an agent who contemplates post-termination competition, is not free to engage in behavior that is tortious or otherwise wrongful. The actions of individual and soon-to-be-former agents may become wrongful when they constitute concerted action designed with the purpose of leaving the principal in the lurch.
>
> …
>
> An employee, especially one in a managerial position or one who works with a wide range of colleagues, also has an opportunity to assess their skills and motivation and potential contributions to a new or existing competitive venture from a vantage point that is inaccessible outside the employer's organization. Employees may be able to time their departures so that maximum competitive injury is inflicted on the employer because their knowledge of the employer's vulnerabilities at particular times is especially acute, enabling employees who make a concerted plan to depart to time their departure *en masse* so as to enhance the injury inflicted on the principal.

Agency Restatement § 8.04 cmts. (b)&(c). Thus, Coleman's and Morris's soliciting and hiring Blue Star's staff while still responsible for managing Blue Star—and then commenting with "joy" about the prospect of making a "clean sweep" of Blue Star's staff in setting up Rock Creek (Dkt. 3 at ¶ 43)—also violated their duties.

Contrary to Blue Star's actual allegations (*see* Dkt. 3 at ¶ 93), nowhere in Blue Star's Complaint does Blue Star allege a breach of fiduciary duty by "preparations to compete," as Defendants try to recharacterize Blue Star's claim. Nothing in Blue Star's claim has to do with a noncompete. (*Cf.* Dkt. 34 at 16.) Nor does Blue Star complain the duty was violated by Rock Creek's mere incorporation with the State or Defendants' arranging for Rock Creek's office lease. (*Cf. id.* at 17.) Indeed, by their actions, Defendants were not merely "look[ing] for other work" (Dkt. 34 at 16–17), making all the "preparation" propositions of law to which Defendants cite wholly inapt. *Cf.* Agency Restatement § 8.04 cmt. c ("[A] former agent's right to compete with the principal is not absolute and does not privilege conduct that would be tortious if committed by a third party. A former agent remains subject to duties concerning confidential information and property of the principal."). Thus, Defendants' surreptitiously taking the Trade-Secret Information *at all* violates their duties. (*See* Dkt. 3 at 27–29, 31–33.)

The *very* premise of their resignations was a new project from an existing Blue Star client, a project presented to Coleman during the time he was VP – Business Development for Blue Star, and about which he first tried to negotiate with Blue Star about how Blue Star would handle it. (Dkt. 3 at ¶¶ 33, 36.) Taking this work violates their fiduciary duties. Agency Restatement § 8.04 cmt. c ("[I]nteractions between an agent and

the customer through which the agent solicits the customer's patronage for the agent's new competitive association breach the agent's fiduciary duty to the principal.").

In these circumstances, Defendants' saying that Blue Star "now attempts to construe [Defendants'] honesty against them" (Dkt. 34 at 18) is more than rich.

### E. Duty of Loyalty.

Defendants say there is no action for breach of a duty of loyalty. (Dkt. 34 at 20.) The Oklahoma Supreme Court has specifically recognized that, under Oklahoma law, there is a duty of loyalty to an employer. *See Hayes v. Eateries, Inc.*, 905 P.2d 778, n. 10 (Okla. 1995). Relevant to Coleman and Morris, this duty reaches diversions of corporate opportunities. *See Warren v. Century Bankcorporation, Inc.*, 741 P.2d 846, 850 n.11 (Okla. 1987) (adopting the "corporate opportunity" doctrine from *Guth v. Loft*, 5 A.2d 503 (Del. 1939)). There, the Oklahoma Supreme Court set forth that

> the elements to establish that a corporate opportunity has been usurped are [1] the opportunity was one in which the corporation had an expectancy, [2] the corporation was able, financially and otherwise, to take advantage of the opportunity itself, and [3] the party charged with taking the opportunity acted in an official, as opposed to an individual, capacity."

*Warren*, 741 P.2d at n.11. In such circumstances, the usurper has the burden of proving that the company "was not stripped of a corporate opportunity." *Id.*

Relevant to Coleman, Morris, and Johnson: Other Oklahoma caselaw discusses the duty of loyalty in the context of the duty to inform. *See Douglas v. Steele*, 816 P.2d 586, 589–90 (Okla. Civ. App. 1991) (describing part of the duty of loyalty as requiring the agent to provide relevant information about proposed plans to help the principal protect itself from loss). Unsurprisingly, courts addressing the duty of loyalty also describe it as

"a duty to protect confidences and a duty to avoid conflicts of interest." *See Livingston v. State*, 907 P.2d 1088, 1091 (Okla. Crim. App. 1995); *see also Hooper v. State*, 947 P.2d 1090, 1115 (Okla. Crim. App. 1997). Plainly the duty exists, in multiple contexts. Consequently, by permitting the claim to survive a Rule 12(b)(6) challenge, this Court would not be "creating a new cause of action." (*Cf.* Dkt. 34 at 21.)

### F.    Tortious Interference.

Defendants say Blue Star cannot allege the Defendants actually interfered with a contract or business expectation. (Dkt. 34 at 21.) Most simply, Defendants' arguments just ignore Blue Star's pleadings. Defendants recharacterize Blue Star's actual pleadings about tortious interference, as if they are about exclusivity contracts (*id.*), which have no relevance to Blue Star's Complaint.[16] Defendants' problem, of course, is that they were plainly aware of the work Blue Star had with its clients (*e.g.*, Coleman downloaded from Blue Star the client contracts then in force), and thus cannot argue that that very work moving to Rock Creek was not the result of tortious interference with an existing contract. And as to tortious interference with a business expectation, again, the *very* premise of Coleman's and Morris's resignations was a new project from an existing Blue Star client, presented to Coleman during the time he was VP –Business Development for Blue Star. (Dkt. 3 at ¶¶ 33, 36.) In fact, both are sufficiently pleaded.

### III.    CONCLUSION

The Court should deny the Motion and grant Blue Star all other general relief.

---

[16]    Defendants also say that some of the specific evidence to which Blue Star referred—a contract with a client—could be cancelled at any time upon 48-hours notice (*id.* at 22), but Defendants fail to suggest that notice was ever given (it was not).