# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BLUE STAR LAND SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | Case No. CIV-17-931-R |
| | ) | |
| DEVON ENERGY PRODUCTION | ) | |
| COMPANY, L.P., | ) | |
| | ) | |
| Intervenor Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THEO C. COLEMAN, JEFFREY D. MORRIS | ) | |
| AMARA S. JOHNSON, f/k/a AMARA | ) | |
| SINCLAIR, and ROCK CREEK LAND & | ) | |
| ENERGY COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendants' Motion to Dismiss, Doc. 34. Plaintiff Blue Star
Land Services, LLC ("Blue Star") filed its Complaint and Request for Seizure, Doc. 3,
under the federal Defend Trade Secrets Act of 2016 ("DTSA"), Oklahoma's Uniform
Trade Secrets Act ("UTSA"), and Oklahoma common law. Following an ex parte seizure
(Doc. 10) of Defendants' electronic devices and Dropbox account containing potential
trade secret information and a subsequent preliminary injunction (Doc. 25), Defendants
filed this Motion. Considering Plaintiff's allegations in the light most favorable to it, the
Court grants the Motion in part with respect to Defendant Johnson and denies it with
respect to Defendants Coleman, Morris, and Rock Creek for the following reasons.

## I.    Background

According to Plaintiff's Complaint, this case concerns a contentious business split and the legitimacy of departing employees' competitive conduct through their departure. Defendants Theo Coleman and Jeffrey Morris were the only vice presidents of Blue Star, a "boutique, full services" firm that provides critical land and regulatory services for large oil and gas companies such as Devon Energy and Marathon Oil. Doc. 3, at 7 n.1. After five years as vice presidents, the two left Blue Star in April of 2017 to start a competing company, Rock Creek Land & Energy Company, LLC ("Rock Creek").

Blue Star possesses extensive confidential information that helps it compete against other outside brokers. It maintains rig schedules and section-township-range maps that details wide-ranging information about their clients' rigs, leases, and mineral findings. *See* Doc, 3-46, at 4–5. Blue Star's ownership reports, templates, and other work product allow it to more effectively structure drilling and leasing plans, advise companies, and advocate on their behalf before regulatory commissions. *Id.* at 5–13. More important, while Blue Star has a system for protecting its clients' confidential information and that of Blue Star itself, Defendants Coleman and Morris had near complete access to it all.

Blue Star's founder and president, David Swafford, hired Defendants Coleman and Morris right out of college. *See* Doc. 3, at 9. They progressed through the company ladder before spending five years as vice presidents. *Id.* Plaintiff believes Defendants first plotted their exit in 2013, when Coleman created a spreadsheet outlining Blue Star's financial and operational information. *See* Doc. 3, at 10.  In 2016, Coleman and Morris demanded equity positions with Blue Star, after which Swafford entered into profit-sharing agreements in

October entitling Coleman and Morris to 5% each. *Id.* at 3; *see* Docs. 3-25, 3-26. Four months later, Plaintiff claims Coleman began downloading to his personal Dropbox[1] account confidential, proprietary, and trade-secret information that would soon help him launch a competing company. Doc. 3, at 3.

Then in April of 2017, one of Blue Star's existing clients, LEFCO, approached Coleman and Morris about a new project. *Id.* at 11. Considering the opportunity as either leverage for more equity or business to start a competing company, Coleman continued to download more confidential information to his personal devices. *Id.* All told, this included over 20,000 documents, one of which was a "highly confidential document" comprising all of the company's "IP addresses, user names, and passwords for authorized users across its entire electronic system." *Id.* at 13. With most of Blue Star's recent work product allegedly in possession, Coleman and Morris demanded from Swafford majority ownership and control of the company. *Id.* at 13–14. Swafford declined and the parties agreed to part ways. *Id.*

Defendants Coleman and Morris then faced a short timeline to build a staff and clientele to launch their new company, Rock Creek. Still employed by Blue Star, they first reached out to Defendant Johnson, "the next-highest-ranking individual[] at Blue Star." Doc. 3, at 23. She responded that she needed "at least a couple weeks" to "make some $$" at Blue Star before leaving for Rock Creek. *Id.* at 15. Yet, when Johnson gave Swafford her two-week notice of resignation the following week, she allegedly misrepresented that

---

[1] Dropbox is a cloud-based file-hosting service that allows account holders and their subscribers to synchronize work on shared files.

she was leaving Blue Star to get engaged and move with her fiancé to South Carolina or Florida. *Id.* at 23. Nonetheless, Johnson stayed on and accessed her new Rock Creek email the following day from her Blue Star computer. *Id.* at 25. Next Coleman and Morris strategized how to approach the rest of Blue Star's staff, discussing the need for departing employees to tell Swafford that they approached Defendants initially, not vice versa. *Id.* at 16. Following various communication with Blue Star employees and independent contractors, Defendants Coleman and Morris now employ at least nine former Blue Star staffers at Rock Creek. *Id.* at 31.

Plaintiff also alleges that Defendants poached various Blue Star clients. Coleman incorporated Rock Creek on April 21st, 2017, two days before accessing existing Blue Star contracts with LEFCO and Black Hawk to substitute the party name as "Rock Creek." *Id.* at 17–19. Then on the 24th, Morris and Coleman submitted their resignation letters, to be effective on the 28th. *Id.* at 19; Docs. 3-30, 3-33. Morris proceeded to research how to delete email records, which Plaintiff believes was intended to "delete evidence of their disloyal actions." Doc. 3, at 19. Coleman began emailing clients to inform them of their departure and competing venture. *Id.* at 20. Similarly, Morris gave clients alternative Blue Star contacts for future projects, but only connected these "clients with alternative Blue Star employees who Morris knew or believed already had plans to go to Rock Creek following Morris and Coleman's exit." *Id.* at 20–21. Later, Morris searched, "is it ethical to delete work emails" and made various attempts to delete Blue Star emails. *Id.* at 21–22. The next morning, when Swafford learned of another employee's defection to Rock Creek, he requested that Coleman and Morris leave Blue Star "ASAP." *Id.* at 23. Shortly after,

Coleman informed a coworker that Rock Creek was taking Blue Star's existing "Merge Project" for LEFCO. *Id.* at 24. Additionally, Defendants allegedly interfered with existing and prospective Blue Star contracts with Southwest Energy Partners, Double Eagle, and Luxe. *Id.* at 37.

On August 29th, 2017, following an extensive audit by forensic investigator Ernst & Young ("EY") of Defendants' old Blue Star computers and accounts, Plaintiff filed their Complaint, Doc. 3, alleging:

(1) Violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (all Defendants);

(2) Violation of Oklahoma's Uniform Trade Secrets Act, 78 Okla. Stat. §§ 85–94 (all Defendants);

(3) Breach of fiduciary duty (Coleman and Morris);

(4) Breach of the duty of loyalty (Coleman, Morris, and Johnson); and

(5) Tortious interference with existing contract and prospective economic advantage (all Defendants)

## II. Motion to Dismiss Standard

A complaint may be dismissed upon a motion for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Dismissal is proper "if, viewing the well-pleaded factual allegations in the complaint as true and in the light

most favorable to the non-moving party, the complaint does not contain 'enough facts to state a claim to relief that is plausible on its face.'" *Macarthur v. San Juan County,* 497 F.3d 1057, 1064 (10th Cir. 2007) (quoting *Twombly,* 550 U.S. at 547); *see Iqbal,* 556 U.S. at 676–80. The plaintiff cannot merely give "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Such conclusory allegations are not entitled to the court's presumption for the plaintiff. Instead, the plaintiff must plead facts that at least makes the claims plausible and raise the "right of relief above the speculative level." *Id.* at 558.

### III.    Trade Secrets Misappropriation Claims

Plaintiff brings trade secrets claims against all Defendants under both the federal DTSA and Oklahoma's UTSA. Before assessing the merits, the Court must first dispose of Plaintiff's threshold "law of the case" argument. Plaintiff claims that the "law of the case" doctrine precludes the Court from considering Defendants' Motion with regard to Plaintiff's misappropriation claims because the Court's earlier ex parte seizure order necessarily held that the Complaint satisfied a standard beyond Rule 12(b)(6)'s plausibility requirements. *See* Doc. 10. Granted, the Court found "extraordinary circumstances" justifying an ex parte seizure and that "it clearly appears from specific facts" that Plaintiff satisfied the DTSA's eight ex parte seizure order requirements. 18 U.S.C. § 1836(b)(2)(A)(i)–(ii). However, an ex parte order, without the presence of opposing counsel's advocacy, does not constitute law of the case. Law of the case "has a narrower meaning in connection with the duty of a judge to adhere to a ruling previously made in the case by another judge of the same court. . . . [It] requires that the order of the first judge,

unless merely a formal or an *ex parte order*, shall not be vacated or nullified by a later judge of the same court." *Munro v. Post*, 102 F.2d 686, 688 (2d Cir. 1939) (emphasis added); *see also In re Ford Motor Co.*, 591 F.3d 406, 414 (5th Cir. 2009) ("By not having expert testimony, and by relying on *ex parte* orders obtained without the presence of opposing counsel, the MDL court again erred."); *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006). Clearly, the "law of the case" doctrine is not applicable here. Therefore, the Court must proceed to an independent 12(b)(6) review of Plaintiff's Complaint.

## A. Federal Trade Secrets Claim

Plaintiff plausibly pleads a violation of the federal DTSA against Defendants Coleman, Morris, and Rock Creek. The law provides a private cause of action against those who have misappropriated trade secrets related to a product or service intended for interstate commerce. *See* 18 U.S.C. § 1836(b)(1). The term "trade secret" includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> **(A)** the owner thereof has taken reasonable measures to keep such information secret; and
>
> **(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3). "Misappropriation" in this context includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5). The DTSA further defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." 18 U.S.C. § 1839(6)(A). Thus, to show a DTSA violation, Plaintiff must plausibly plead (1) trade matter, (2) reasonable secrecy, (3) independent economic value resulting from this secrecy, (4) acquisition of the trade secret, (5) improper means, (6) culpability, and (7) relation to interstate commerce.[2]

First, Plaintiff's Verified Trade Secret Exhibit easily satisfies the trade matter requirement: Blue Star's client rig schedules and section-township-range maps plausibly constitute "business . . . plans" or "compilations." 18 U.S.C. § 1839(3); *see* Doc. 3-46, at 4–5. Its ownership reports also appear to be business compilations. *See* Doc. 3-46, at 5. Further, given that trade matter can be "memorialized physically . . . or in writing," Plaintiff plausibly classifies hundreds of work templates as "processes" or "techniques." 18 U.S.C. § 1839(3); Doc. 3-46, at 8. Similarly, Blue Star's confidential client contracts are plausible "forms [or] types of financial [or] business . . . information," though classifying them in one of the DTSA's more specific categories is difficult. Nonetheless,

---

[2] The parties seem to assume that Plaintiff must plead damages under both the federal and state trade secrets statutes. However, every federal court that has held so either preceded the federal DTSA or merely assumed without reference to the DTSA's text that it adopts the state UTSA's damages requirement. *See, e.g.*, *Ukranian Future Credit Union v. Seikaly, et al.*, No. 17-CV-11483, 2017 WL 5665960, at *8 (E.D. Mich. Nov. 27, 2017); *Space Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 WL 3007078, at *2 (N.D. Cal. July 14, 2017); *Phyllis Schlafly Revocable Tr. v. Cori*, No. 16-CV-01631-JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016); *In re TXCO Res., Inc.*, 475 B.R. 781, 822–23 (Bankr. W.D. Tex. 2012). While damages may come into play eventually pursuant to 18 U.S.C. § 1836(b)(3)(B), pleading them is not required at this stage for a federal misappropriation claim.

when viewed in the aggregate and in the light most favorable to Plaintiff, these contracts and much of the "Blue Star Operating Information" are physical manifestations of DTSA "financial" and "business . . . compilations [and] processes." Doc. 3-46, at 12; 18 U.S.C. § 1839(3).

Defendants' main contention is that Plaintiff is highly over-inclusive in its "trade secrets" definition. They argue that the Complaint and its exhibited employment contracts references "Trade-Secret Information" as a shorthand for *all* client-specific confidential information, without regard for the DTSA definition. The Complaint's Dropbox file listings also include various unrelated and often personal documents. *See* Doc. 3-4. However, Plaintiff's allegedly overbroad definition and failure to cull out irrelevant documents from a Dropbox log does not nullify the plausibility of all claims.[3] To the contrary, Plaintiff cites various documents that appear to constitute DTSA trade matter.

Second is the question of whether Plaintiff took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). As this "reasonable" qualification suggests, "[a]lthough the law requires secrecy, it need not be absolute." *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986). Plaintiff lays out various security measures it took to keep Blue Star and its clients' information "extremely, closely guarded." Doc. 3, at 3; s*ee* Docs. 3, at 8; 3-46, at 18–20. They include limiting access to a need-to-know basis, password-protecting company servers and networks, contractually

---

[3] It does, however, make for nearly 300 pages of Complaint exhibits—the majority of which have no bearing on Plaintiff's claims and should have been filtered out for brevity and privacy purposes. *See* LCvR7.1(n) ("Unnecessarily voluminous exhibits, attachments, and appendices to filings should be avoided.").

binding staffers and third parties for confidentiality, limiting outside-the-office network access to senior management and three other staffers, and other similar protections. *Id.*

Defendants dispute this characterization and argue that that much of Plaintiff's allegedly "confidential" information is "the same information that virtually every landman . . . in the business possesses." Doc. 34, at 16 & n.5. Moreover, Plaintiff has allegedly made no effort to compel return of this protected information from contractors after a project has terminated. *Id.* As to Plaintiff's allegedly "confidential contracts," Defendants are correct. In contrast to Plaintiff's treatment of other allegedly protected information, it declined to file its "Amended Master Land Services" contract under seal. *See* Doc. 3-31. Moreover, the contract is a clear spinoff of a publicly available online template. *See* Doc. 34, at 20–21 (citing http://ocsbbs.com/content/pdf/regulatory/master.pdf). Yet, as to the rest of the trade matter referenced above, the Court judges the allegations in the light most favorable to Plaintiff and finds that Plaintiff took reasonable measures to protect secrecy.

Third, the trade matter must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). Plaintiff alleges that Blue Star's trade matter possesses "independent economic value" in the fact that competitors—if unable to access trade matter like rig schedules, maps, ownership reports, and work templates—lack Blue Star's advantage in rig location, leasing, regulatory processes, and other matters. Rather, competitors lacked this advantage until now, as Rock Creek allegedly functions in

a highly competitive market *because* of their acquisition and use of such trade matter. One example from the Complaint illustrates this value further:

> **Marathon Oil Company Section-Township-Range Map**. It shows the location of the client's leases for each 640-acre tract. The tracts are color-coded to show the company's leasing priorities, *i.e.*, the specific areas where the company is most interested in buying leases, based upon the client's (a) knowledge of already discovered minerals and (b) internal, expert analysis about the likelihood of return on investment in each particular 640-acre tract. With this one map, a competitor would know precisely where to compete for leases—whether for its own exploration, or to bundle the leases and then turn the package to the exploration company at a premium.

Docs. 3, at 2–3; 3-46, at 5. *See also In re SandRidge Energy, Inc. S'holder Derivative Litig.*, No. CIV-13-102-W, 2014 WL 4716006, at *4–5 (W.D. Okla. Sept. 22, 2014). Thus, Plaintiff plausibly pleads the "independent economic value" requirement as well.

Fourth, the "acquisition" requirement is rather straightforward.[4] 18 U.S.C. § 1839(5). The Complaint details Defendant Coleman's step-by-step actions to download protected information to his Dropbox account before leaving with Defendant Morris to found Rock Creek. Doc. 3, at 12–13. Specifically, while still at Blue Star, Coleman "uploaded 20,788 items to his personal Dropbox account. . . . By taking one year of business email (including all attachments), Coleman copied approximately 90% of Blue Star's work product produced over the final year of his employment with Blue Star . . . ." *Id.* at 12. It is less clear that Defendant Morris acquired this trade matter, but the Complaint

---

[4] Defendants improperly attempt to heighten DTSA requirements to include not just acquisition, but use. *See* Doc. 34, at 20. Yet, they cite a case that preceded the DTSA's 2016 passage, *Micro Consulting, Inc. v. Zubeldia*, 813 F. Supp. 1514, 1534 (W.D. Okla. 1990). The statute clearly reads that "disclosure or use" is merely one way to show misappropriation, but it also suffices to show "acquisition of a trade secret of another by a person . . . ." 18 U.S.C. § 1839(5). Thus, Plaintiff does not have to additionally plead use for a federal misappropriation claim.

plausibly shows that Morris was aware of Coleman's acquisition and acted in concert with his soon-to-be Rock Creek partner during the Dropbox transfer. *See* Doc. 3, at 13 ("Morris edited an excel spreadsheet named the 'TJL Roster' and uploaded it to a Dropbox folder apparently shared by both Morris and Coleman, named 'JT.'"). Therefore, Plaintiff plausibly shows acquisition.

Fifth, Defendants' acquisition must have occurred through "improper means," in this case through "breach of [the] duty to maintain secrecy." 18 U.S.C. § 1839(5)–(6)(A). Defendants rightly note that the contracts between Blue Star and its "independent contractors" Theo Coleman, Inc., JD Morris Investments, Inc., and Amstar Land Services, LLC—which include extensive provisions on data protection and keeping proprietary information in "the strictest confidence"—do not necessarily bind Defendants once converted to employees. Docs. 3-22; 3-23; 3-24; *see* Doc. 3, at 9 ("Coleman and Morris . . . became Blue Star's only vice-presidents and key employees . . . ."). Regardless, Defendants' "Profit Sharing Compensation Agreement" with Blue Star does prohibit "intentional disclosure of [the] company's confidential information contrary to [its] policies." Docs. 3-25, at 2; 3-26, at 2. The Complaint also delineates various company policies to maintain such secrecy. *See* Docs. 3, at 8; 3-46, at 18–20. Thus, Plaintiff plausibly shows that Defendants acquired trade matter through "improper means," breaching a duty to maintain secrecy. 18 U.S.C. § 1839(5).

The sixth DTSA requirement is culpability, that the person who acquires the trade matter "knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5). Beyond Defendants Coleman and Morris's presumed

awareness of Blue Star confidentiality policies as vice presidents, the Complaint shows that they affirmatively exhibited awareness of this duty to maintain secrecy. Defendant Morris searched "is it ethical to delete work emails." Doc. 3, at 21. Defendant Coleman emailed a client discussing a conflict of interest waiver, "we will never use the proprietary information from either company to assist in our work for the other." Doc. 3-36, at 3. Coleman also sent a company-wide email "remind[ing] everyone to dispose of any personal or proprietary information in the shred boxes . . . . This includes ownership reports, title opinions, address lists that include personal information and anything else that isn't of public record." Doc. 3-45, at 1. Despite awareness of Blue Star policies, Defendants allegedly worked together to knowingly acquire this trade matter.

Lastly, Blue Star's alleged trade secret information is clearly "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The information relates to (1) oil intended for use in interstate commerce and (2) land and regulatory services provided for national oil and gas companies. *See* Doc. 3, at 6–7. Thus, the Complaint plausibly meets each of the DTSA's requirements for a federal trade secrets misappropriation claim against Defendants Coleman, Morris, and Rock Creek.

## B. State Trade Secrets

Oklahoma's UTSA establishes a greater burden to plead a trade secrets misappropriation claim. "To prove misappropriation of a trade secret, [Plaintiff] must show (i) the existence of a trade secret, (ii) misappropriation of the secret by defendants, and (iii) use of the secret to [Plaintiff's] detriment." *MTG Guarnieri Mfg., Inc. v. Clouatre*, 239

P.3d 202, 209 (Okla. Civ. App. 2010); *see* OUJI-Civ 29.1, MISAPPROPRIATION OF TRADE SECRETS – ELEMENTS. Although the state "trade secrets" and "misappropriation" definitions are nearly identical to the DTSA, Plaintiff must additionally show "use" and "detriment." *Compare* 18 U.S.C. § 1839, *with* 78 Okla. Stat. § 86.

The question of use is a difficult and somewhat speculative one. Defendants highlight that Plaintiff's allegations mostly concern Defendants' *potential* for use. *See, e.g.*, Doc. 3, at 30 ("Rock Creek *may be* significantly tempted to . . . . *[O]ne could* create a [shadow] LLC for the competitive work . . . and thereby shield the true owner . . . in a way that *would* mask the improper use of the Trade-Secret Information . . . .") (emphasis added).

However, Plaintiff does plead enough to plausibly show that Rock Creek's very existence and success thus far evinces Defendants' use:

> [R]everse engineering [the Work Templates] would be practically impossible. To create these hundreds of forms from scratch—whether from memory or experience—would, at minimum, take Morris and Coleman more than many months of day-to-day work, and in reality, could only be done with the assistance of and reliance upon Blue Star's Trade-Secret Information.
>
> . . . .
>
> With these Work Templates and other Trade-Secret Information, a competitor start-up could compete from day one . . . . Perhaps the above explains why Coleman and Morris absconded with the material that they currently deny having taken.
>
> . . . .
>
> Coleman and Morris apparently put this information to use in their preparations to compete. The[y] prepared a document named the TJL Roster . . . . In its final version, it appears to be the document housing Coleman and

Morris's business plan blueprint for their new company, but it contains Blue
Star's financial data and employee information.

. . . .

To Swafford, there is no reasonable doubt that this [spreadsheet] was
Coleman and Morris's blueprint. Indeed, much of the information comes
from Blue Star documents that Coleman and Morris apparently shared in a
Dropbox folder.

Doc. 3-46, at 10–17. These allegations are indeed somewhat speculative, but finding them

insufficient would place an excessive burden on employers with limited means to

demonstrate actual use pre-discovery. Plaintiff's use claim is plausible enough to withstand

Defendants' Motion.

Plaintiff has also plausibly pled detriment. Oklahoma Uniform Jury Instructions

instruct that misappropriation must be "the direct cause of damages to Plaintiff," but the

subsequent Comments clarify that "detriment" would suffice. OUJI-Civ 29.1 & cmts.; *see*

*also MTG*, 239 P.3d at 209. Oklahoma's UTSA instructs courts to measure damages from

trade secrets misappropriation by "actual loss," "unjust enrichment," or in lieu of these

measurements, "a reasonable royalty for a misappropriator's unauthorized . . . use of a

trade secret." 78 Okla. Stat. § 88(A). Further, "[a] flexible approach is applied to the

calculation of damages in a misappropriation of trade secrets case." *In re Mandel*, 578 F.

App'x 376, 390 (5th Cir. 2014); *see also Computer Assocs. Int'l, Inc. v. Am. Fundware,*

*Inc.*, 831 F. Supp. 1516, 1526 (D. Colo. 1993) ("The proper measure of damages for

misappropriation of trade secrets case can be elusive, and courts are encouraged to be

flexible and imaginative.") (internal quotations omitted).

Plaintiff details various damages from Defendants' misappropriation, including: unjust enrichment from their use of Blue Star's work templates (Doc. 3-46, at 11), actual damages to the value of Plaintiff's client information now that various rig schedules and leasing maps are no longer confidential (*id.* at 4–5), actual damages to Plaintiff's market share and, conversely, unjust enrichment to Defendants from using trade secrets to launch Rock Creek and compete directly with Blue Star (*id.* at 11, 13). Plaintiff therefore pleads a plausible Oklahoma UTSA misappropriation claim against Defendants Coleman, Morris, and Rock Creek as well.

## C. Failure to Plead Misappropriation Against Defendant Johnson

Plaintiff fails to plead factual allegations demonstrating a plausible federal or state misappropriation of trade secrets claim against Defendant Johnson. Plaintiff alleges, "on information and belief, that Johnson knew or had reason to know [that other Defendants acquired, used, or disclosed trade secrets] and engaged in such activity injuring Blue Star." Doc. 3, at 34 n.10. Such a conclusory allegation would be sufficient if, like for Defendants Coleman, Morris, and Rock Creek, Plaintiff offered facts detailing her acquisition, use, or awareness of the scheme. However, Plaintiff has only pled the following facts regarding Johnson: She deceived Blue Star to remain on the payroll longer before joining Rock Creek, accessed her Rock Creek email once while at Blue Star, and deleted Blue Star files and conversation history. *See* Doc. 3, at 23, 25–26. In other words, Plaintiff implies that because Johnson deceptively joined a competitor, she must have known about its misappropriation of Blue Star's trade secrets. Liability by association is not enough, nor is "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Therefore, Plaintiff's misappropriation claims against Defendant Johnson do not "state a claim to relief that is plausible on its face." *Id.* at 547.

## IV.    Breach of Fiduciary Duty

Plaintiff next claims that Defendants Coleman and Morris breached their fiduciary duty, which requires showing a (1) fiduciary duty and (2) breach that (3) directly caused Plaintiff damages. *See* OUJI 26.1. Oklahoma looks to the Third Restatement of Agency for the various fiduciary duties that agents owe their principals. *See* OIJI 27.3 cmts; Third Restatement of Agency § 801 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). In the trade secrets information context, Defendants' duty is rather simple—"not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." Third Restatement of Agency § 8.05(2). The Restatement's Comment continues:

> An agent's duties concerning confidential information do not end when the agency relationship terminates. An agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record of them or retains them in the agent's memory. If information is otherwise a trade secret or confidential, the means by which an agent appropriates it for later use or disclosure should be irrelevant. Feats of human memory, however commendable and intriguing in many respects, should not be privileged as instruments of disloyal conduct.

Third Restatement of Agency § 8.05 cmt. c. Plaintiff plausibly claims that (1) Defendants Coleman and Morris had a "fiduciary or confidential" relationship with Plaintiff as vice presidents. *Krug v. Helmerich & Payne, Inc.*, 320 P.3d 1012, 1017 (Okla. 2013); *see* Restatement of Employment Law § 8.01 TD No 3 (2010) ("Only higher-level employees

such as managers or others in positions of authority or confidence are subject to higher fiduciary standards distinct from the basic duty of loyalty."); (2) they breached this duty by allegedly misappropriating and using trade secrets and other confidential information to benefit their new competing business; and (3) it directly caused Plaintiff damages. Thus, Plaintiff pleads a plausible breach of fiduciary duty claim against Defendants Coleman and Morris.

## V. Breach of Duty of Loyalty

Plaintiff also claims that Defendants Coleman, Morris, and Johnson breached their duty of loyalty to Blue Star. The Restatement provides:

> (a) An employee breaches the duty of loyalty to the employer if, without the employer's consent, the employee while employed with the employer competes with the employer.
>
> (b) Competition under subsection (a) includes solicitation of business from the employer's customers or recruitment of other employees to leave the employer to work for a potential competitor, but it does not include reasonable preparation to compete.
>
> . . . .
>
> [Comment (a)]: Although employees may not compete with a current employer, they may take reasonable preparatory steps to be in a position to compete upon terminating the employment relationship . . . , so long as the preparation is not done on company time or by using company resources

Restatement of Employment Law § 8.04 TD No 3. Oklahoma appears to classify the duty of loyalty as one of multiple duties owed by fiduciaries to their principals. *See, e.g.*, *Graves v. Johnson*, 359 P.3d 1151, 1156 (Okla. Civ. App. Mar. 16, 2015); *Sw. Stainless, L.P. v. Sappington*, No. 07-CV-0334-CVE-FHM, 2008 WL 3013548, at *26–27 (N.D. Okla. Aug. 1, 2008) (reversed on other grounds); *State ex rel. Oklahoma Bar Ass'n v. Gassaway*, 196

P.3d 495, 503 (Okla. 2008). Defendants argue that no case explicitly recognizes this duty as the basis for a standalone cause of action. However, given the Restatement and available Oklahoma precedent, the Court will allow Plaintiff to proceed at this stage if it can show a plausible breach.

With respect to Defendants Coleman and Morris, Defendants alleged solicitation of Blue Star's employees and clients constitutes a plausible effort to "compete" with their employer. Defendants rightly note that at-will employees are free to quit whenever and join a competitor, just as clients are free to take their business elsewhere. However, the Court must view the facts in the light most favorable to Plaintiff, and Plaintiff pleads that Defendants actively solicited employees and clients. *See* Doc. 3, at 15–16, 18, 20–21, 31. Further, Defendants' alleged misappropriation was also intended to compete with Blue Star, and Plaintiff is entitled to plead alternate theories for the same underlying conduct. Thus, Plaintiff pleads a plausible breach of the duty of loyalty against Defendants Coleman and Morris.

Turning to Defendant Johnson, her conduct would not constitute a breach of the duty of loyalty. Plaintiff alleges that before leaving Blue Star to join Rock Creek, Johnson (1) lied about why she was leaving the company in order to stay on the payroll for two more weeks (Doc. 3, at 23), (2) accessed her Rock Creek email one time (*id.* at 25), (3) deleted Lync conversation history, Microsoft Office emails, and Dropbox files (*id.* at 26), and (4) "knew or had reason to know [about Blue Star's misappropriated trade secrets] and engaged in such activity injuring Blue Star." (*id.* at 34 n.10). Lying about why she was leaving and spending a de minimis time accessing her new email address while "on

company time" does not mean that Johnson "compete[d]" with her employer. Restatement of Employment Law § 8.04 TD No 3. Plaintiff also fails to allege particular content that, if Johnson deleted, would constitute a breach of the duty of loyalty. In other words, why is Johnson's deletion history anything beyond mere suspicious behavior by an employee nervous to transition to a competitor? As to Plaintiff's "knew or had reason to know" misappropriation allegation, it is simply too conclusory and speculative to constitute a breach of the duty of loyalty. Thus, Plaintiff's claim against Defendant Johnson for breach of the duty of loyalty is dismissed.

## VI. Tortious Interference

Lastly, Plaintiff successfully pleads that Defendants Coleman, Morris, and Rock Creek tortiously interfered with its existing contracts and prospective economic advantage. Tortious interference with contract requires:

> (1) that the plaintiff had a business or contractual right that was interfered with;
>
> (2) that the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and
>
> (3) that damage was proximately caused as a result of the interference.

*Temeron, Inc. v. Ferraro Energy Corp.*, 861 P.2d 319, 325 (Okla. Civ. App. 1993) (citing *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427 (Okla. 1979)). Tortious interference with prospective economic advantage requires:

> (1) the existence of a valid business relation or expectancy;
>
> (2) knowledge of the relationship or expectancy on the part of the interferer;
>
> (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship has been disrupted.

*Gonzalez v. Sessom*, 137 P.3d 1245, 1249 (Okla. Civ. App. 2006).

Plaintiff claims that Defendants interfered with existing contracts and business expectancies with clients LEFCO, Black Hawk, Southwest Energy Partners, Double Eagle, and Luxe. *See* Doc. 3, at 37. For example, allegedly while still employed by Blue Star, Defendants Coleman and Morris were approached by an agent of LEFCO for a new project. *See id.* at 11. After failing to leverage that business into better equity positions at Blue Star, Coleman and Morris informed Swafford that they planned to take it with them to their new venture. *Id.* at 13–14. Coleman then incorporated Rock Creek the following day while still employed by Blue Star. *Id.* at 17. By the weekend, Coleman had accessed and reformatted existing Blue Star contracts with LEFCO and Black Hawk to substitute Rock Creek's information. *Id.* at 18-19. Plaintiff shows emails illustrating how even after Swafford requested that Coleman and Morris leave Blue Star "ASAP," Coleman informed staff that he was taking Blue Star's existing "Merge Project" for LEFCO to Rock Creek. *Id.* at 24. Plaintiff's extensive allegations concerning misappropriated trade secrets also bear on Plaintiff's relevant intent and conduct in poaching these existing and prospective business opportunities. *See* Doc. 3-46.

Defendants argue that Plaintiff cannot satisfy a contractual right or expectancy necessary for tortious interference claims because the contracts for these clients were non-exclusive and could be cancelled at any time without cause following thirty-days notice. *See* Doc. 34, at 28 (citing Doc. 3-31). The nature of these contracts is certainly relevant to Plaintiff's rights, but Defendants fail to show why these provisions forfeit Plaintiff's

recovery altogether. After all, Plaintiff maintained active contracts and an offer for a new contract that—while potentially less valuable given the nature of these non-exclusivity and short notice provisions—Defendants allegedly poached nonetheless. Therefore, Plaintiff's tortious interference claims against Defendants Coleman, Morris, and Rock Creek survive Defendants' Motion.

However, like Plaintiff's other claims against Defendant Johnson, its tortious interference claims against her are wholly conclusory. Plaintiff first alleges that Johnson "tortiously interfered with Blue Star's valid, existing contracts with LEFCO, Black Hawk, [et cetera]." Doc. 3, at 37. However, the factual allegations above concerning how Defendants tortiously interfered only implicate Defendants Coleman, Morris, and Rock Creek. By contrast, Plaintiff's claim against Johnson is merely a "the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556, U.S. at 678. Plaintiff also alleges that:

> In the alternative if necessary, on information and belief, Johnson knew of Coleman, Morris, and Rock Creek's plan to tortiously interfere with Blue Star's valid, existing contracts with the above-listed clients [and their plan to tortiously interfere with Blue Star's prospective economic advantage,] had the intent to assist them in committing the tortious interference and gave them assistance or encouragement, and her assistance or encouragement was a substantial factor in causing the tortious interference with Blue Star's existing contracts with the above-listed clients.

*Id.* at 37–38. These allegations, save for the mention of specific clients, constitute an insufficient "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, Plaintiff has failed to plead a plausible tortious interference claim against Defendant Johnson.

### VII.    Conclusion

Plaintiff pleads plausible federal and state trade secrets misappropriation claims against Defendants Coleman, Morris, and Rock Creek; breach of fiduciary duty and the duty of loyalty claims against Defendants Coleman and Morris; and tortious interference claims for existing contracts and prospective economic advantage against Defendants Coleman, Morris, and Rock Creek. However, Plaintiff's claims against Defendant Johnson do not meet the 12(b)(6) plausibility standard. Accordingly, the Motion to Dismiss is GRANTED in part with respect to all claims against Defendant Johnson and DENIED with respect to all claims against Defendants Coleman, Morris, and Rock Creek.

IT IS SO ORDERED this 8th day of December, 2017.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE